# United States Court of Appeals for the Federal Circuit

---

**MID CONTINENT NAIL CORPORATION,**
*Plaintiff-Appellee,*

**v.**

**UNITED STATES,**
*Defendant-Appellant,*

AND

**TARGET CORPORATION,**
*Defendant-Appellant.*

---

2012-1682, -1683

---

Appeal from the United States Court of International Trade in No. 10-CV-0247, Judge Nicholas Tsoucalas.

---

Decided: July 18, 2013

---

ADAM H. GORDON, Wiley Rein LLP, of Washington, DC, argued for plaintiff-appellee. With him on the brief were ROBERT E. DEFRANCESCO, III, and LORI E. SCHEETZ. Of counsel was CHARLES O. VERRILL, JR.

PATRICIA M. MCCARTHY, Assistant Director, Commercial Litigation Branch, Civil Division, United States

Department of Justice, of Washington, DC, argued for defendant-appellant United States. With her on the brief were STUART F. DELERY, Principal Deputy Assistant Attorney General, and JEANNE E. DAVIDSON, Director. Of counsel on the brief was NATHANIEL HALVORSON, Attorney International, Office of Chief Counsel, for Import Trade Administration, United States Department of Commerce, of Washington, DC.

MARGUERITE E. TROSSEVIN, Jochum Shore & Trossevin, PC, of Washington, DC, argued for defendant-appellant Target Corporation.

———————————

Before DYK, LINN, and PROST, *Circuit Judges.*

DYK, *Circuit Judge.*

Defendants Target Corporation and the United States appeal from a judgment of the Court of International Trade ("Trade Court") rejecting the Department of Commerce's ("Commerce") interpretation of an antidumping order on nails from the People's Republic of China. The Trade Court held that the steel nails included in certain household tool kits imported by Target were subject to the order. We vacate the judgment, and remand to the Trade Court with directions that it remand to Commerce for further proceedings.

BACKGROUND

I

When participants in a domestic industry believe that competing foreign goods are being sold in the United States at less than their fair value, they may petition Commerce to impose antidumping duties on importers. *See* 19 U.S.C. § 1673a(b); *Walgreen Co. of Deerfield, Ill. v. United States*, 620 F.3d 1350, 1351 (Fed. Cir. 2010). If Commerce determines that "the subject merchandise is

being, or is likely to be, sold in the United States at less than its fair value," and the International Trade Commission makes certain related determinations, Commerce issues an antidumping duty order. *See* 19 U.S.C. §§ 1673d-e. This order "includes a description of the subject merchandise, in such detail as [Commerce] deems necessary." § 1673e(a)(2).

After an order has issued, importers may seek "'scope rulings' that clarify the scope of an order . . . with respect to particular products." 19 C.F.R. § 351.225(a),(c). Although there is no statutory provision defining the criteria to be applied in scope rulings, our cases and Commerce's regulations have to some extent defined the process by which the agency decides whether a particular product is included within the scope of an order. *See Walgreen*, 620 F.3d at 1356-57; 19 C.F.R. § 351.225(k).

This case presents the question of whether otherwise-subject merchandise (nails) that is packaged and imported together with non-subject merchandise (assorted household tools) as part of a so-called "mixed media" item (a tool kit) is subject to an antidumping order that in terms covers the included merchandise, and makes no exception for mixed media items. Commerce has historically treated the answer to this question as depending on whether the mixed media item is to be treated as a single, unitary item, or a mere aggregation of separate items. *See Walgreen*, 620 F.3d at 1355-56. As discussed below, the statute and Commerce's regulations do not address mixed media issues specifically, and the statute's mandate for Commerce to write its orders in "such detail as [Commerce] deems necessary," *see* § 1673e(a)(2), cannot be read to authorize Commerce to provide inadequate notice to regulated parties.

II

The antidumping order in this case originated from a petition filed by plaintiff Mid Continent Nail Corporation

("Mid Continent") and other domestic companies, alleging dumping of certain nails imported from China. *See Certain Steel Nails from the People's Republic of China and the United Arab Emirates: Initiation of Antidumping Duty Investigations*, 72 Fed. Reg. 38,816, 38,817 (Dep't of Commerce July 16, 2007). Commerce's antidumping order contained an exhaustive description of the physical characteristics of the subject nails, including their length, construction, finish, head shape, and point shape, but did not address mixed media items. *See Notice of Antidumping Duty Order: Certain Steel Nails from the People's Republic of China* ("*Final Order*"), 73 Fed. Reg. 44,961, 44,961-62 (Dep't of Commerce Aug. 1, 2008). The order also noted that "steel nails subject to [the order] are currently classified under the Harmonized Tariff Schedule of the United States ('HTSUS') subheadings 7317.00.55, 7317.00.65 and 7317.00.75," which apply to various types of iron and steel nails, but specified that "[w]hile the HTSUS subheadings are provided for convenience and customs purposes, the written description of the scope of [the order] is dispositive." *Id.*

In December 2009, after the order issued, Target requested a scope ruling clarifying whether "the brass plated steel nails [included in certain] household tool kits . . . f[e]ll within the scope of the antidumping order." J.A. 32. Target described six tool kits, each of which consisted of a plastic toolbox or bag containing a variety of household tools (such as screwdrivers, measuring tapes, and hammers), as well as "a small . . . compartmentalized plastic box containing [an assortment of screws, tacks, and hooks] and approximately 50 one-inch brass coated steel nails of a type typically used with . . . picture hooks." J.A. 33-34. In each case, Target estimated that the nails represented between 0.8% and 3.3% of the cost of the tool kit and between 0.5% and 1.8% of its retail value. Target conceded that the nails were of the type described in the antidumping order.

Commerce issued a scope ruling in August 2010. Regarding the mixed media inquiry, Commerce stated that although the nails "would meet the physical requirements of steel nails that fall within the scope of the [order] if they were imported without any of the other tool kit components," "the proper focus of the analysis is on the nails as contained in the household tool kits." J.A. 212. In reaching this determination, Commerce looked to the so-called "(k)(2) criteria" found in the agency's general scope-ruling regulations, *see* 19 C.F.R. § 351.225(k)(2). Commerce found that "the ultimate purchaser would not pay [the retail price of the tool kits] to receive a small quantity of steel nails, when steel nails can be purchased in larger quantities for a much lower price"; "the tool kits serve a broader use of home or office repairs rather than strictly to fasten or hang objects, [which is] the ultimate use of subject steel nails"; the channel of trade used to sell the tool kits "is distinctly different from the channel of trade for nails"; and "the brass coated steel nails contained within the six tool kits comprise, at most, a tangential feature in the advertising of these tool kits." *See* J.A. 214-16. Commerce concluded that "Target's six household tool kits encompassing brass coated steel nails are excluded from the scope of the order." J.A. 207.

Mid Continent challenged Commerce's ruling, and the Trade Court vacated it, finding Commerce's explanation insufficient. *Mid Continent Nail Corp. v. United States*, 770 F. Supp. 2d 1372 (Ct. Int'l Trade 2011). The court remanded for Commerce to "identify not only a test it will employ consistently" for conducting mixed media inquiries, but also "the legal justification for employing such a test at all." *Id.* at 1383.

On remand, Commerce cited three sources of authority for conducting a mixed media inquiry: the antidumping statute, which requires duties to be applied to a particular "class or kind of foreign merchandise," 19 U.S.C. § 1673; the agency's regulations, which acknowledge that anti-

dumping orders "must be written in general terms" and authorize the agency to issue scope rulings, 19 C.F.R. § 351.225(a); and our opinions in *Walgreen* and in *Crawfish Processors Alliance v. United States*, 483 F.3d 1358 (Fed. Cir. 2007). Commerce also announced a four-factor test that it would henceforth rely on to "address [mixed media] question[s]." J.A. 225. The agency declared that it henceforth

> will consider, at the time of importation: (1) the practicability of separating the component merchandise for repackaging or resale; (2) the value of the component merchandise as compared to the value of the product as a whole; (3) the ultimate use or function of the component merchandise relative to the ultimate use or function of the mixed-media set as a whole; and (4) any other relevant factors that may arise on a product-specific basis.

J.A. 225. Regarding the first factor, Commerce found that "[b]ecause the [nails were] packaged in the same case that contained similar non-subject fasteners, . . . it would be impractical to remove the [nails] for the purpose of reselling." J.A. 229. Regarding the second factor, Commerce found that "the value of the steel nails within the tool[ ]kits is very small as compared to the value of the entire tool[ ]kit." J.A. 229. Regarding the third factor, the agency determined that the purpose of the tool kits was "to provide a convenient collection of tools and accessories for the intention of home repair and maintenance," and that "[t]he general purpose of steel nails, fastening two objects together, while complementary, is not the same as the purpose of a tool[ ]kit." J.A. 230. Commerce also found that "the choice of the tool[ ]kit selected [by the end-user] is not based exclusively upon the inclusion of the steel nails." J.A. 230. Finally, Commerce did not identify "any other relevant factors which it [found] necessary to the mixed-media analysis for [the] tool[ ]kits under consideration." J.A. 230.

On review, the Trade Court once again vacated Commerce's ruling and remanded to Commerce, holding that because there was no clear language in the final anti-dumping order addressing mixed media items, Commerce had no authority to conduct a mixed media inquiry and exclude otherwise-subject merchandise that is included in a mixed media item. *Mid Continent Nail Corp. v. United States*, 825 F. Supp. 2d 1290, 1295-96 (Ct. Int'l Trade 2012).

On remand, Commerce revised its ruling to comply with the Trade Court's holding interpreting the order so as to cover the nails included within the tool kits. On review again, the Trade Court affirmed. *Mid Continent Nail Corp. v. United States*, 34 I.T.R.D. (BNA) 1839 (Ct. Int'l Trade 2012). Target and the United States appealed to this court. We have jurisdiction under 28 U.S.C. § 1295(a)(5).

## DISCUSSION

We review the Trade Court de novo, applying the same substantial-evidence standard of review that it applies in reviewing Commerce's determinations. *Global Commodity Grp. LLC v. United States*, 709 F.3d 1134, 1138 (Fed. Cir. 2013); *Walgreen*, 620 F.3d at 1354.

## I

In issuing scope rulings, "'Commerce . . . enjoys substantial freedom to interpret and clarify its antidumping orders. But while it may interpret those orders, it may not change them.'" *Novosteel SA v. United States*, 284 F.3d 1261, 1269 (Fed. Cir. 2002) (quoting *Ericsson GE Mobile Commc'ns, Inc. v. United States*, 60 F.3d 778, 782 (Fed. Cir. 1995)). We therefore afford "significant deference to Commerce's interpretation of a scope order," so long as Commerce's interpretation is not "contrary to the order's terms" and does not "change the scope of the order." *Global Commodity Grp.*, 709 F.3d at 1138. In particular,

"orders may be interpreted as including subject merchandise only if they contain language that specifically includes the subject merchandise or may be reasonably interpreted to include it." *Duferco Steel, Inc. v. United States*, 296 F.3d 1087, 1089 (Fed. Cir. 2002).

While this particular case does not involve a claim of lack of notice by a party on whom duties have been imposed, the requirement that antidumping orders only be applied to merchandise that they may be reasonably interpreted to include ensures that before imposing a significant exaction in the form of an antidumping duty, Commerce will provide "adequate notice of what conduct is regulated by the order." *See Fuji Photo Film Co. v. Int'l Trade Comm'n*, 474 F.3d 1281, 1292 (Fed. Cir. 2007). The requirement therefore reflects the broader due-process principle that before an agency may enforce an order or regulation by means of a penalty or monetary sanction, it must "provide regulated parties fair warning of the conduct [the order or regulation] prohibits or requires." *See Christopher v. SmithKline Beecham Corp.*, 567 U.S. __, __, 132 S. Ct. 2156, 2167 (2012) (quotation marks omitted); *Trinity Broad. of Fla., Inc. v. FCC*, 211 F.3d 618, 628 (D.C. Cir. 2000); *United States v. Chrysler Corp.*, 158 F.3d 1350, 1354 (D.C. Cir. 1998); *Gen. Elec. Co. v. U.S. Envtl. Prot. Agency*, 53 F.3d 1324, 1328-30 (D.C. Cir. 1995); *see also Fuji Photo*, 474 F.3d at 1292-93; *In re Bogese*, 303 F.3d 1362, 1368 (Fed. Cir. 2002).[1]

---

[1]     As the Supreme Court noted recently in *Christopher*:

Our practice of deferring to an agency's interpretation of its own ambiguous regulations undoubtedly has important advantages, but this practice also creates a risk that agencies will promulgate vague and open-ended regulations that they can later interpret as they see fit, there-

We have not often been confronted with mixed media cases requiring interpretation of Commerce's orders. In *Walgreen*, we approved Commerce's decision to include merchandise within an antidumping order even though it was imported for sale with other items. The order in *Walgreen* covered "tissue paper having a basis weight not exceeding 29 grams per square meter." *See Walgreen*, 620 F.3d at 1353 (quotation marks omitted). We sustained Commerce's determination that the inclusion of otherwise-subject tissue paper within a gift bag set containing non-subject wrapping materials did not affect its status as subject merchandise. *Id.* at 1355-57. In that case, Commerce relied both on the broad (though non-specific) language of the final order and on specific statements in the regulatory history that "all subject merchandise . . . is subject to this proceeding, whether or not it is sold or shipped with non-subject merchandise." *See id.* at 1356-57 (quotation marks omitted). *Walgreen* concluded that Commerce did not err in finding that tissue paper included in mixed-media gift bag sets was subject to the order. *See id.*

While our decision in *Walgreen* addressed Commerce's

---

by frustrat[ing] the notice and predictability purposes of rulemaking. It is one thing to expect regulated parties to conform their conduct to an agency's interpretations once the agency announces them; it is quite another to require regulated parties to divine the agency's interpretations in advance or else be held liable when the agency announces its interpretations for the first time in an enforcement proceeding and demands deference.

567 U.S. at __, 132 S. Ct. at 2168 (alteration in the original) (footnote, citations, and quotation marks omitted).

discretion to construe antidumping orders so as to include material covered by the literal terms of the order, we have not previously addressed under what circumstances Commerce has the authority to interpret an antidumping order so as to exclude material that is within the literal terms of the order. But just as orders cannot be extended to *include* merchandise that is not within the scope of the order as reasonably interpreted, merchandise facially covered by an order may not be *excluded* from the scope of the order unless the order can reasonably be interpreted so as to exclude it.

Because orders are subject to interpretation, the Trade Court erred in holding that in the absence of clear language in the final order, Commerce categorically lacks the authority to conduct a mixed media inquiry and to exclude from the scope of the order otherwise-subject merchandise included within a mixed media item. As we held in *Walgreen*, Commerce's practice of conducting mixed media inquiries falls within its "'responsibility . . . to determine the scope of the final orders.'" *See Walgreen*, 620 F.3d at 1355 (quoting *Duferco*, 296 F.3d at 1097). The mere fact that the order in this case makes no explicit reference to mixed media items does not conclusively establish that Commerce lacked authority to consider the order's applicability to nails contained within such items.

II

While we disagree with the Trade Court that Commerce is foreclosed by the broad language of the antidumping order from interpreting the order to exclude nails included within mixed media tool kits, we agree with the Trade Court that Commerce has not yet reasonably interpreted the order in this case so as to justify such an exclusion. Commerce does not attempt to defend the rationale of its original ruling, and its redetermination on remand relied only on newly announced criteria for interpretation that did not exist at the time that the order was

issued. We think a remand is required to give Commerce one last opportunity to interpret its order. We also think it appropriate to provide the following guidance for the remand proceedings in this case, as well as for future cases.

The interpretive process for a scope determination relating to mixed media items necessarily involves two steps. First, Commerce must determine whether the potentially-subject merchandise included within the mixed media item is within the literal terms of the antidumping order. If it is, then Commerce must determine whether the inclusion of that merchandise within a mixed media item should nonetheless result in its exclusion from the scope of the order.

We note that this case presents no question in the first step as to whether the nails are within the literal terms of the order. In cases where the literal scope of the order is at issue, the procedure for conducting this inquiry is specified in our cases and Commerce's regulations. *See* 19 C.F.R. § 351.225(k); *Walgreen*, 620 F.3d at 1352. Commerce must first examine the language of the final order. *See Tak Fat Trading Co. v. United States*, 396 F.3d 1378, 1382 (Fed. Cir. 2005); *Duferco*, 296 F.3d at 1097. If the language is ambiguous, Commerce must next consider the regulatory history, as contained in the so-called "(k)(1) materials": "[t]he descriptions of the merchandise contained in the petition, [Commerce's] initial investigation, and the [prior] determinations of [Commerce] (including prior scope determinations) and the [International Trade] Commission." 19 C.F.R. § 351.225(k)(1); *see Tak Fat*, 396 F.3d at 1382-83; *Duferco*, 296 F.3d at 1097 n.14.

If the (k)(1) materials are not dispositive, Commerce then considers the (k)(2) criteria: "[t]he physical characteristics of the product," "[t]he expectations of the ultimate purchasers," "[t]he ultimate use of the product," "[t]he channels of trade in which the product is sold," and

"[t]he manner in which the product is advertised and displayed." § 351.225(k)(2); *see Walgreen*, 620 F.3d at 1352. If the manner in which the otherwise-subject merchandise is incorporated into the mixed media item alters these properties so comprehensively as to effect a "substantial transformation" in the merchandise, such that it "can no longer be considered" the same merchandise, then the included merchandise is not subject to the order. *See Crawfish Processors*, 483 F.3d at 1362-63. For example, in *Crawfish Processors*, the court determined that the meat in crawfish étouffée had been so "substantially transformed" by its incorporation into the stew that it no longer constituted "freshwater crawfish tail meat" within the meaning of the antidumping order, and was therefore non-subject merchandise. *See id.* at 1363-64 (quotation marks omitted).

In this case, the parties agree that the included merchandise—the nails within the tool kits—is within the literal terms of the order. In other words, there is no contention here that the imported nails were not "nails" within the literal language of the antidumping order.

Having determined that the included merchandise would be subject to the order if considered in its own right, Commerce must then proceed to the next step and decide whether the inclusion of the merchandise within a mixed media item takes it outside the scope of the order.

Once again, the process must begin with the language of the order, which provides the "predicate for the interpretive process." *See Duferco*, 296 F.3d at 1097. If an order stated, for example, that "all subject merchandise is subject to [the order], whether or not it is sold or shipped with non-subject merchandise," then the scope analysis would be at an end. *Cf. Walgreen*, 620 F.3d at 1355, 1357; *Crawfish Processors*, 483 F.3d at 1359. Conversely, if the order itself indicated that Commerce would determine the applicability of the order to otherwise-subject merchan-

dise included within mixed media items in light of the factors identified by Commerce in the remand proceedings in this case—"the practicability of separating the [included] merchandise for repackaging or resale," "the value of the [included] merchandise as compared to the value of the [mixed media item] as a whole," and "the ultimate use or function of the [included] merchandise relative to the ultimate use or function of the mixed[ ]media [item] as a whole," *see Mid Continent*, 825 F. Supp. 2d at 1293-94—then there would be no question that these factors would be the proper ones to consider in conducting the mixed media inquiry.[2]

Where, as here, the language of the order is silent, Commerce must next determine whether the (k)(1) materials help to interpret the order. These materials consist of "[t]he descriptions of the merchandise contained in [(1)] the petition, [(2) Commerce's] initial investigation, and [(3)] the [prior] determinations of [Commerce] (including prior scope determinations) and the [International Trade] Commission." *See* 19 C.F.R. § 351.225(k)(1). We have previously noted that these sources are relevant to mixed media inquiries. *See Walgreen*, 620 F.3d at 1357.

Here, there is nothing in the history of the antidumping order (items 1 and 2 above) to suggest that the literal language of the order should not govern in mixed media cases. Neither does that history conclusively establish that it should not. Mid Continent argues that certain comments it made in the course of Commerce's antidumping investigation are relevant to the mixed media in-

---

[2]    The fourth "factor" announced, but not relied on, by Commerce in this case—"any other relevant factors that may arise on a product-specific basis," *see id.* at 1294—does not provide affected parties with any notice of what facts Commerce will consider in its inquiry, and is therefore not an appropriate factor to rely on.

quiry.[3] Unlike the petition itself, however, subsequent comments made by the petitioners are not relevant under subsection 351.225(k)(1). We see no reason to give any weight to these comments where, as here, Commerce did not address the comments during the investigation. *Cf. Walgreen*, 620 F.3d at 1355 (affording no deference to an importer's characterization of its mixed media item as a unitary item in its scope ruling request).

Once Commerce has determined that the included merchandise would be subject to the order if examined in its own right, and that neither the text of the order nor its history indicates that subject merchandise should be treated differently on the basis of its inclusion within a mixed media item, we believe that a presumption arises that the included merchandise is subject to the order.

---

[3] During the investigation, an importer that is not a party to this appeal filed a comment seeking to exclude from the proceedings nails that were sold as part of a kit together with a pneumatic nail gun, arguing that such kits were not of the same "'class or kind' of merchandise" as the nails at issue in the investigation. *See Certain Steel Nails from the People's Republic of China: Preliminary Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances and Postponement of Final Determination*, 73 Fed. Reg. 3928, 3928-29 (Dep't of Commerce Jan. 23, 2008). Mid Continent objected, "stat[ing] for the record that [it had] always intended the[] proceedings to cover all . . . steel nails exhibiting the physical characteristics described in the written scope description, whether imported alone or as part of a set of goods including non-[subject] merchandise." J.A. 98; *see also* 73 Fed. Reg. at 3929. Before Commerce could weigh in, the importer withdrew its request and replaced it with a new request "framed solely in terms of [the] physical characteristics" of the nails it wished to exclude. *See* 73 Fed. Reg. at 3929.

This presumption arises from the need to recognize that "[t]he primary source in making a scope ruling is the antidumping order being applied." *See Walgreen*, 620 F.3d at 1356; *see also Tak Fat*, 396 F.3d at 1382 ("The language of the order determines the scope of an antidumping duty order."); *Duferco*, 296 F.3d at 1097 ("Repeatedly, decisions of this court confirm that [a]lthough the scope of a final order may be clarified, it can not be changed in a way contrary to its terms." (alteration in the original) (quotation marks omitted)).

In order to overcome this presumption, Commerce must identify published guidance issued prior to the date of the original antidumping order (in this case, August 1, 2008) that provides a basis for interpreting the order contrary to its literal language. While the Administrative Procedure Act does not forbid agencies from using adjudicative proceedings to develop new interpretations of statutes, regulations, or orders, *see NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294 (1974), it does require agencies "to avoid the inherently arbitrary nature of unpublished ad hoc determinations," *see Morton v. Ruiz*, 415 U.S. 199, 232 (1974) (emphasis removed). *Cf.* 44 U.S.C. § 1507 (providing that "[a] document required by [law] to be published in the Federal Register is not valid as against a person who has not had actual knowledge of it" until it is so published).

In some cases, this guidance may be found in the third of the (k)(1) criteria—"the [prior] determinations of [Commerce] (including prior scope determinations)," *see* 19 C.F.R. § 351.225(k)(1)—so long as these prior determinations were publicly available at the time that the antidumping order was issued.[4] While Commerce's scope

---

[4]     As we suggested in *Walgreen*, prior scope rulings interpreting the *same* antidumping order are particularly relevant under subsection 351.225(k)(1), *see Walgreen*, 620 F.3d at 1356, assuming that they do not articulate

rulings are labeled "[p]ublic [d]ocument[s]," *see, e.g.*, J.A. 155, 169, it is unclear whether they are publicly available.[5]

Another problem with these prior scope rulings is that they lack clarity. In *Walgreen*, we observed that in its prior mixed media scope rulings, Commerce has eschewed developing any "formal definition[s]," "generally applicable criteria," or "bright line rule[s]" for conducting mixed media inquiries, and has instead relied on "ad hoc determinations." *Walgreen*, 620 F.3d at 1355-56. These prior scope rulings do establish that there exists in some circumstances an implicit mixed media exception even in the absence of explicit language in the final order (as *Walgreen* confirmed); however, they provide only limited guidance regarding the scope of that exception, or the

---

new interpretive criteria. The parties have not pointed to any prior rulings interpreting the steel nails order. However, such rulings—which by definition were not publicly available at the time the antidumping order was issued—cannot be used to articulate new interpretive criteria not announced when the antidumping order was originally issued.

[5] Prior scope rulings do not appear to be available on the agency's public website. Commerce's regulations require the agency to publish a quarterly list of completed rulings in the Federal Register, along with a "brief description" of each ruling. *See* 19 C.F.R. § 351.225(o). These "brief description[s]" only state the agency's conclusion, however, and not its reasoning. *See, e.g.*, *Notice of Scope Rulings*, 76 Fed. Reg. 10,558, 10,559 (Dep't of Commerce Feb. 25, 2011) ("A–570–909: Steel Nails from the People's Republic of China. Requestor: Target Corporation; six household toolkits, including brass coated steel nails, taken as a whole, are not within the scope of the antidumping duty order; August 10, 2010.").

circumstances in which it may be applied. Commerce concedes that these ad hoc determinations provided no ascertainable standard that would allow importers to predict how Commerce would treat their mixed media products, and that it "ha[d] not previously provided a complete listing of the factors it may consider when conducting a mixed[ ]media analysis." *See* J.A. 225. Nonetheless, on remand Commerce may attempt to draw an ascertainable standard from these rulings if they were publicly available at the time the antidumping order issued in August 2008.

Prior scope rulings are not the only sources of guidance which Commerce may consider. Just as Commerce may look to the (k)(1) materials in the course of its mixed media analysis, it may similarly rely on the (k)(2) factors, to the extent that they are relevant to resolving the mixed media inquiry. Commerce may also consult the HTSUS classification system in deciding whether a tool kit is a single, unitary item or a mere aggregation of items, if Commerce can point to prior published rulings in support of this practice. Significantly, the language in the steel nails order makes no reference to HTSUS subheadings other than those covering nails. We do not decide whether by relying on these sources Commerce could reasonably interpret its antidumping order to exclude the nails included within Target's toolkits. We simply hold that Commerce may attempt to develop such an interpretation utilizing the sources we have identified.

In summary, we think that a remand is necessary to allow Commerce to revisit its mixed media determination in light of the requirement that any implicit mixed media exception to the literal scope of the order must be based on preexisting public sources. In remanding, we continue to recognize that Commerce's antidumping orders "'must be written in general terms'" and "in such detail as [Commerce] deems necessary"; that "[e]ach case must be decided on [its] particular facts"; and that Commerce

enjoys considerable discretion in interpreting its own orders. *See* 19 U.S.C. § 1673e(a)(2); *Walgreen*, 620 F.3d at 1352, 1355-56 (quoting 19 C.F.R. § 351.225(a)); *Novosteel*, 284 F.3d at 1269. We also recognize that the practical difficulty of requiring importers to pay, and the government to collect, antidumping duties on *de minimis* imports may be considerable. At the same time, Commerce must adhere to the scope of its duly issued antidumping orders, as reasonably interpreted in light of established and consistent principles of interpretation. *See Duferco*, 296 F.3d at 1095-97.

\* \* \*

We finally note that Commerce's problems are largely self-inflicted, because in the past Commerce has given low priority to an approach that should receive the highest priority from any administrative agency—providing coherent and consistent guidance to regulated parties. We note also that in the future, many of the problems presented by this case could be avoided if Commerce were to identify in its antidumping orders or in prospective regulations the factors that it will consider in resolving mixed media and other cases.

CONCLUSION

We vacate the Trade Court's ruling, and remand for further proceedings consistent with this opinion.

**VACATED AND REMANDED**

COSTS

Costs to neither party.