**Slip Op. 23-29**

# UNITED STATES COURT OF INTERNATIONAL TRADE

<table>
<tr><td>

AA METALS, INC.,

               Plaintiff,

          v.

UNITED STATES,

               Defendant,

          and

TEXARKANA ALUMINUM, INC.,

               Defendant-Intervenor.

</td><td>

Before: Jane A. Restani, Judge

Court No. 22-00051

**PUBLIC VERSION**

</td></tr>
</table>

## <u>OPINION</u>

[Sustaining Commerce's Final Scope Determination.]

Dated: March 10, 2023

<u>Kristen S. Smith</u> and <u>Sarah E. Yuskaitis</u>, Sandler, Travis & Rosenberg, PA, of Washington, DC, argued for plaintiff AA Metals, Inc.

<u>Eric E. Laufgraben</u>, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant. With him on the brief were <u>Brian M. Boynton</u>, Principal Deputy Assistant Attorney General, <u>Patricia M. McCarthy</u>, Director, and <u>Reginald T. Blades, Jr.</u>, Assistant Director. Of counsel on the brief was <u>Leslie Lewis</u>, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

<u>Peter J. Koenig</u>, Squire Patton Boggs (US) LLP, of Washington, DC, argued for defendant-intervenor Texarkana Aluminum, Inc. With him on the brief was <u>Jeremy W. Dutra</u>.

Restani, Judge:  This action challenges a final scope determination of the United States

Department of Commerce ("Commerce") regarding common alloy aluminum sheet ("CAAS")

imported by AA Metals, Inc. ("AA Metals"). The Final Scope Determination found that certain

CAAS exported from China to Turkey and further worked by Turkish company PMS Metal

Profil Alüminyum San. Ve Tic. A.Ş. ("PMS") before importation into the United States is within

the scope of antidumping and countervailing duty orders. See Notification of Final Scope

Determination and Response to Covered Merchandise Referral, P.R. 48 (Jan. 21, 2022) ("Final

Scope Determination").

AA Metals asks for judgment on the record, arguing the Final Scope Determination is

unsupported by substantial evidence and is otherwise not in accordance with law. See Pl. AA

Metals, Inc.'s Mem. of Points and Authorities in Supp. of its R. 56.2 Mot. for J. on the Agency

Record at 11–13, ECF No. 21 (July 7, 2022) ("AA Metals Br."). AA Metals asserts that

Commerce improperly determined that the language of the scope was dispositive and that

Commerce failed to address 19 C.F.R. § 351.225(k)(1) factors. Id. 12, 21–23. AA Metals argues

this resulted in an unlawful expansion of the antidumping and countervailing duty orders's

scopes. Id. at 21–25. AA Metals also asserts several other arguments, including that Commerce

should have given AA Metals the opportunity to address and correct deficiencies in the record,

and that Commerce was required to do a substantial transformation analysis. Id. at 17–21, 32–

37. The United States argues that Commerce's dispositive language determination was

appropriate, that there were no deficiencies in the questionnaire responses, and that a substantial

transformation analysis was unnecessary. Def.'s Resp. to Pl.'s R. 56.2 Mot. for J. Upon the

Agency Record at 8–9, 12, ECF No. 26 (Nov. 3, 2022) ("Government Br."). For the following

reasons, the court affirms Commerce's determination.

## BACKGROUND

### I.       Antidumping and Countervailing Duty Orders

In November 2017 Commerce initiated antidumping and countervailing duty investigations for CAAS from China.  See Common Alloy Aluminum Sheet From the People's Republic of China: Initiation of Less-Than-Fair-Value and Countervailing Duty Investigations, 82 Fed. Reg. 57,214 (Dep't Comm. Dec. 4, 2017); see also AA Metals Br. at 2.  A year later Commerce published its affirmative final antidumping and countervailing duty determination. Antidumping Duty Investigation of Common Alloy Aluminum Sheet From the People's Republic of China: Affirmative Final Determination of Sales at Less-Than-Fair Value, 83 Fed. Reg. 57,421 (Dep't Comm. Nov. 15, 2018); Countervailing Duty Investigation of Common Alloy Aluminum Sheet From the People's Republic of China: Final Affirmative Determination, 83 Fed. Reg. 57,427 (Dep't Comm. Nov. 15, 2018); see also AA Metals Br. at 4.

In January 2019 the International Trade Commission ("ITC") published an injury determination.  Response of AA Metals, Inc. & Teknik Alüminyum San. Ve Tic. A.Ş. to the Department's October 27, 2021 Supplemental Questionnaire at Ex. 6, C.R. 12, P.R. 43 (Nov. 5, 2021) ("SQR").  The determination covered China's various aluminum products, including clad and non-clad aluminum sheet.  SQR, Ex. 6 at I-10–I-12.  The ITC determination utilized the same scope as Commerce's investigations, examining CAAS defined as

> Aluminum common alloy sheet (common alloy sheet), which is a flat-rolled aluminum product having a thickness of 6.3 mm or less, but greater than 0.2 mm, in coils or cut-to-length, regardless of width. Common alloy sheet within the scope of this investigation includes both not clad aluminum sheet, as well as multi-alloy, clad aluminum sheet. With respect to not clad aluminum sheet, common alloy sheet is manufactured from a 1XXX-, 3XXX-, or 5XXX-series alloy as designated by the Aluminum Association. With respect to multi-alloy, clad aluminum sheet, common alloy sheet is produced from a 3XXX-series core, to which cladding layers are

applied to either one or both sides of the core.Common alloy sheet may be made to ASTM specification B209–14, but can also be made to other specifications. Regardless of specification, however, all common alloy sheet meeting the scope description is included in the scope. Subject merchandise includes common alloy sheet that has been further processed in a third country, including but not limited to annealing, tempering, painting, varnishing, trimming, cutting, punching, and/or slitting, or any other processing that would not otherwise remove the merchandise from the scope of the investigations if performed in the country of manufacture of the common alloy sheet.

Excluded from the scope of this investigation is aluminum can stock, which is suitable for use in the manufacture of aluminum beverage cans, lids of such cans, or tabs used to open such cans. Aluminum can stock is produced to gauges that range from 0.200 mm to 0.292 mm, and has an H–19, H–41, H–48, or H–391 temper. In addition, aluminum can stock has a lubricant applied to the flat surfaces of the can stock to facilitate its movement through machines used in the manufacture of beverage cans. Aluminum can stock is properly classified under Harmonized Tariff Schedule of the United States (HTSUS) subheadings 7606.12.3045 and 7606.12.3055.

Id. at I-10.

The injury determination further defined "aluminum sheet" as a "thin wrought aluminum product that is produced via rolling process" and noted that "wrought aluminum" consists of "aluminum products that are rolled, drawn, extruded, or otherwise mechanically formed of aluminum or aluminum alloys." Id. at I-12. Thus, the scope of the subject merchandise addressed by the ITC was defined to be rolled, wrought aluminum within a certain thickness range. The determination then went into detail discussing 3XXX-series alloy and noted that common applications for CAAS Alloy [[      ]] include "heat exchangers, air condition evaporators" and other appliances. Id. The data collected based on this scope from U.S. producers and importers involved eight products, four of which were identified as Alloy [[      ]]. Id. at V-5. Although the products varied in alloy, temper, and dimensions, the ITC requested information about only two types of tempers in this eight-product survey: H and O. Id.

*Confidential Information Omitted*

Seven of the products were H temper products, and the remaining product surveyed was O

temper.  Id.

The ITC published a notice of its affirmative finding that "an industry in the United

States is materially injured by reason of imports of common alloy aluminum sheet from China,"

determining several types of aluminum sheets were sold in the United States at less than fair

value and were subsidized by the government of China in February 2019.  Common Alloy

Aluminum Sheet from China; Determinations, 84 Fed. Reg. 1,784 (ITC Feb. 5, 2019).

After the ITC made its affirmative injury determination and published its CAAS from

China determination, Commerce issued antidumping and countervailing duty orders on CAAS

from China.  See Common Alloy Aluminum Sheet From the People's Republic of China:

Antidumping Duty Order, 84 Fed. Reg. 2813 (Dep't Comm. Feb. 8, 2019) ("Antidumping

Order"); see also Common Alloy Aluminum Sheet From the People's Republic of China:

Countervailing Duty Order, 84 Fed. Reg. 2157 (Dep't Comm. Feb. 6, 2019) ("Countervailing

Order") (collectively, "the Orders").  These orders cover merchandise described as:

> aluminum common alloy sheet (common alloy sheet), which is a flat-rolled
> aluminum product having a thickness of 6.3 mm or less, but greater than 0.2 mm,
> in coils or cut-to-length, regardless of width. Common alloy sheet within the scope
> of this order includes both not clad aluminum sheet, as well as multi-alloy, clad
> aluminum sheet. With respect to not clad aluminum sheet, common alloy sheet is
> manufactured from a 1XXX-, 3XXX-, or 5XXX-series alloy as designated by the
> Aluminum Association. With respect to multi-alloy, clad aluminum sheet, common
> alloy sheet is produced from a 3XXX-series core, to which cladding layers are
> applied to either one or both sides of the core.
>
> Common alloy sheet may be made to ASTM specification B209-14, but can
> also be made to other specifications. Regardless of specification, however, all
> common alloy sheet meeting the scope description is included in the scope.

Antidumping Order, 84 Fed. Reg. at 2815; see also Countervailing Order, 84 Fed. Reg. 2157.

The Orders included one explicit exclusion for aluminum can stock:

Excluded from the scope of this order is aluminum can stock, which is suitable for use in the manufacture of aluminum beverage cans, lids of such cans, or tabs used to open such cans. Aluminum can stock is produced to gauges that range from 0.200 mm to 0.292 mm, and has an H-19, H-41, H-48, or H-391 temper. In addition, aluminum can stock has a lubricant applied to the flat surfaces of the can stock to facilitate its movement through machines used in the manufacture of beverage cans. Aluminum can stock is properly classified under Harmonized Tariff Schedule of the United States (HTSUS) subheadings 7606.12.3045 and 7606.12.3055.

Id.

## II.     Scope Proceeding

Texarkana Aluminum, Inc. ("Texarkana") filed a Enforce and Protect Act ("EAPA") petition on March 16, 2020, and amended the petition on May 19, 2020, alleging that AA Metals entered Chinese-origin aluminum sheet into the United States that was transshipped through Turkey after minor processing and falsely declared it as originating from Turkey. Placement of Covered Merchandise Referral Documents on the Record at 2, P.R. 4 (Aug 18, 2021). On June 30, 2020, CPB initiated an investigation under EAPA. Id. at 3. The petition specified two scenarios that Texarkana contended should be investigated: Scenario 1) Chinese-origin aluminum sheet of a thickness a little greater than covered by the scope is re-rolled in Turkey to a thickness covered by the scope; and Scenario 2) Chinese-origin aluminum sheet of a thickness covered by the scope is re-rolled in Turkey to a thickness still covered by the scope. Id. at 4.

On May 13, 2021, Commerce received a covered merchandise referral from Customs and Border Protection ("CBP") regarding EAPA investigation No. 7469. Id. CBP notified Commerce that CBP was unable to determine whether the merchandise in the two scenarios Texarkana specified was covered. Final Scope Determination at 2.

Commerce issued initial and supplemental questionnaires to AA Metals about both scenarios, to which AA Metals responded. See Initial Questionnaire Response, C.R. 1–6 (Sept.

27, 2021) ("IQR"); see also SQR.  Texarkana also submitted a rebuttal to AA Metals's initial response, to which AA Metals submitted a surrebuttal.  Final Scope Determination at 3–4.  AA Metals, for its part, requested that Commerce investigate Texarkana's counsel for misconduct and possible sanctions pursuant to 19 C.F.R. § 351.313.  Id. at 4.

Commerce issued its Final Scope Determination on January 21, 2022.  Id. at 1.  The Determination evaluated the two scenarios identified by Texarkana as excess.  Id.  In the Final Scope Determination, Commerce found Scenario 1 merchandise to be outside the scope of the Orders, but that concluded that Scenario 2 was within the scope and subject to the Orders.  Id. Commerce also refused to investigate AA Metals's claims against Texarkana.  Id. at 4.  AA Metals seeks no relief from the court on this particular matter.

## JURISDICTION & STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2022) and 19 U.S.C. § 1516a(a)(2)(B)(vi) (2021).  This section provides for judicial review of a determination of "whether a particular type of merchandise is within the class or kind of merchandise described in an . . . antidumping or countervailing duty order."  Id.  In conducting review, the court must set aside "any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."  Id. § 1516a(b)(1)(B)(i).

## DISCUSSION

### I.      Legal Framework

The Department's regulation governing scope determinations, 19 C.F.R. § 351.225(k), provides that Commerce will take into account the following: (1) the descriptions of the merchandise contained in the petition, (2) the initial investigation, and (3) the determinations of the Secretary of Commerce (including prior scope determinations) and (4) the United States

International Trade Commission.[1]  19 C.F.R. § 351.225(k)(1) (2021).[2]  If this inquiry fails to

resolve the issue, Commerce applies additional criteria found under 19 C.F.R. § 351.225(k)(2).

Id. § 351.225(k)(2) (2021).  MCC Holdings v. United States, 45 CIT __, __, 537 F. Supp. 3d

1350, 1355 (2021).

The Federal Circuit has held that the first step in the inquiry is consideration of the

language of the Orders.  See Shenyang Yuanda Aluminum Indus. Eng'g Co., Ltd. v. United

States, 776 F.3d 1351, 1356 (Fed. Cir. 2015) ("Scope language is the 'cornerstone' of any scope

determination."); see also Walgreen Co. of Deerfield, IL v. United States, 620 F.3d 1350, 1357

(Fed. Cir. 2010); Duferco Steel, Inc. v. United States, 296 F.3d 1087, 1097 (Fed. Cir. 2002).

Specifically, "Commerce cannot 'interpret' an antidumping order so as to change the scope of

that order, nor can Commerce interpret an order in a manner contrary to its terms."  Eckstrom

Indus., Inc. v. United States, 254 F.3d 1068, 1072 (Fed. Cir. 2001).

If the language of the Orders is ambiguous, (k)(1) factors must be considered.[3]  See Mid

Continent Nail Corp. v. United States, 725 F.3d 1295, 1302 (Fed. Cir. 2013) ("Commerce must

first examine the language of the final order.  If the language is ambiguous, Commerce must next

consider the regulatory history, as contained in the so-called '(k)(1) materials.'"); see also Star

---

[1] These four factors will hereinafter be referred to as "(k)(1) factors."

[2] Commerce has since revised the regulations.  The revised regulations "apply to scope inquiries for which a scope ruling application is filed, as well as any scope inquiry self-initiated by Commerce, on or after November 4, 2021." Regulations To Improve Administrative and Enforcement of Antidumping and Countervailing Duty Laws, 86 Fed. Reg. 52,300 (Sept. 20, 2021); see also id. at 52,374.  As Commerce received the Covered Merchandise Referral from CBP on May 13, 2021, the previous iteration of the regulation applies here, although it is not clear that the change would have affected this case.

[3] The Federal Circuit has been inconsistent in stating whether consideration of (k)(1) factors is necessary if the language of an order appears dispositive.  See Shenyang 776 F.3d at 1357–58 ("In addition to the plain language of the Orders, Commerce will also consider the descriptions of the merchandise contained in the petition, the initial investigation, and the prior determinations of Commerce and the ITC."); but see Star Pipe Prod. v. United States, 981 F.3d 1067, 1073 (Fed. Cir. 2020) (holding that if the language is unclear Commerce must consider the (k)(1) factors).  The language of the applicable regulation itself, however, has no such ambiguity: "the Secretary will take into account" (k)(1) criteria when considering whether a particular product is within the scope of the order.  19 C.F.R. § 351.225(k) (emphasis added).

Pipe Prod. v. United States, 981 F.3d 1067, 1073 (Fed. Cir. 2020).  Even though "it is not

justifiable to identify an ambiguity where none exists," Allegheny Bradford Corp. v. United

States, 28 CIT 830, 843, 342 F. Supp. 2d 1172, 1184 (2004), relevant scope terms are only

unambiguous if they have a "single clearly defined or stated meaning."  Diamond Sawblades

Manufacturers' Coal. v. United States, 51 CIT __, __, 405 F. Supp. 3d 1345, 1352 (2019) (citing

Atkore Steel Components, Inc. v. United States, 42 CIT ___, ___, 313 F. Supp. 3d 1374, 1380

(2018)).  Ambiguity is a common issue in scope cases, as "descriptions of subject merchandise

contained in the Department's determinations must be written in general terms."  19 C.F.R. §

351.225(a).  It is fairly easy to provide a "single clearly defined" meaning when excluding

particular merchandise; it is much harder to do so when including a variety of merchandise in the

statute's required "general terms."

Whether or not the language appears to be dispositive, a scope determination requires an

examination of "the record as a whole, taking into account both the evidence that justifies and

detracts from an agency's opinion."  Falko-Gunter Falkner v. Inglis, 448 F.3d 1357, 1363 (Fed.

Cir. 2006).

II.     **Commerce Did Not Rely on Plain Language Alone, But Considered (k)(1)**
        **Factors**

In its Final Scope Determination analysis of Scenario 2 merchandise, Commerce stated

that the language of the Orders was dispositive and determined further analysis of the factors

listed in 19 C.F.R. § 351.225(k)(1) was unnecessary.  Final Scope Determination at 10.  AA

Metals contends that Commerce erred when it determined that the language was dispositive, and

instead insists that examining the (k)(1) factors is necessary to determine the meaning of the

Orders.  AA Metals Br. at 25–28, 30–31.  AA Metals also asserts that, had all (k)(1) sources been

considered, a narrower interpretation of the Orders would have been clearly established. Id. AA

Metals contends that an examination of all (k)(1) factors would have resulted in excluding

Scenario 2 merchandise, and accordingly Commerce impermissibly expanded the scope beyond

its intended merchandise. Id.

Despite Commerce's assertion that the language of the scope of the Orders is dispositive,

Commerce did not rely on the language alone. In the Final Scope Determination, Commerce

referred to various (k)(1) factors in its analysis of the Orders. Final Scope Determination at 6, 8,

9. First, Commerce described the merchandise using the exact same language as that presented

by Texarkana in the original petition. Final Scope Determination at 6. Second, noting that "the

scope of the Orders does not explicitly define wrought aluminum alloy sheet," Commerce

referred to the Commission's final determination when defining CAAS as "a thin wrought

aluminum product that is produced via a rolling process." Final Scope Determination at 8, see

also SQR, Ex. 6 at I-12. Thirdly, Commerce noted that the scope is consistent with prior scope

determinations, stating that the language "products that otherwise meet the definition of

aluminum sheet in the first paragraph of the scope are subject to the scope" is present in both

findings. Final Scope Determination at 9. In addition, the prior scope determinations Commerce

referenced also addressed arguments about the ITC Investigation, similar to those raised by AA

Metals. See infra pp. 12–13.

Had Commerce been confident that the language of the scope was dispositive, it would

not have needed to reference the above factors. Or perhaps, it wisely decided consideration of

plaintiff's arguments was appropriate. For whatever reason, Commerce apparently concluded

that the language should be considered in context and bolstered the bare language with

consideration of various (k)(1) factors. See Final Scope Determination at 9. In particular, it

cited its own prior determinations regarding the products, which contain more detail about the scope of the Orders.  See id. at n.58.

Significantly, plaintiff has not made it clear how further examination of the initial investigation would change the result here.  Although under the applicable regulation every (k)(1) factor must be considered in some way, the amount of reliance on each factor differs from case to case, as facts change, as analyses differ, and as different arguments are presented.  If an error did occur, as is by no means clear, plaintiff has not demonstrated how remanding this matter for correction of the alleged error would alter the outcome of the antidumping or countervailing proceedings for the parties involved.

As indicated, despite stating the language of the Order was dispositive, Commerce did reference various (k)(1) factors that effectively provided an understanding of the scope that Commerce then applied to the merchandise in question.  The analysis of the language and the various factors, even where brief, was more than "the mere scintilla" of evidence needed for substantial evidence review.  Consolidated Edison Co. v. NLRB, 305 U.S. 197, 217 (1938).

### III.     The Merchandise in Scenario 2 Is Within the Scope of the Orders

### A. The Temper of Scenario 2 Is Within the Scope of the Orders

AA Metals argues that Commerce impermissibly expanded the scope of the Orders to include the Scenario 2 product.  AA Metals Br. at 11.  AA Metals argues that F-temper aluminum alloy is not within the scope of the Orders.  Id. at 26–31.  AA Metals argues that, because F-temper products were not considered in the ITC injury determination, they should be excluded from the scope of the Orders.  Id. at 28–31.

In the Final Scope Determination, Commerce concluded that because Scenario 2 merchandise did not meet the explicit exclusions of the scope determination, and the scope

language of the Orders states that "products that otherwise meet the definition of aluminum sheet in the first paragraph of the scope are subject to the scope," F-temper products are within the scope of the Orders. See Final Scope Determination at 9. To support this, Commerce relied upon a previous scope determination that specifically stated that F-tempered products are within the scope of an order with identical scope language.[4] Id. at 9; see also IQR, Ex. 2 at 9–11 ("2021 Final Decision").

In the 2021 Final Decision, Commerce responded to comments made by foreign and domestic aluminum manufacturers regarding scope. See generally 2021 Final Decision. Comment 3 of the Decision discussed the inclusion of F-temper re-roll stock. Id. at 9–11. Plaintiff Hulamin argued that F-temper products should be outside of the scope, and that including F-tempered stock "is contrary to the domestic like product in the China aluminum sheet investigations and subsequent China Aluminum Sheet Orders." Id. at 9–10. Noting that F-tempered product includes re-roll stock, Hulamin asserted that "proprietaries [sic] of re-roll stock are not established until further processing that only occurs after downstream production," and that re-roll stock is an "intermediary product." Id. at 10. Domestic petitioners pushed back on these arguments, asserting that "Commerce did not include a code for 'F' temper products because neither Commerce, nor the petitioners, had any information that significant volumes of such aluminum sheet products entered the United States from China during the period of investigation."[5] Id. Petitioners also argued that "re-rolled stock is a flat-rolled, coiled aluminum

---

[4] AA Metals argues that as this previous scope determination did not address China directly, Commerce erred in relying on this memorandum. This is incorrect. 19 C.F.R. 351.225(k)(1) factors require that Commerce will take into account "determinations of the Secretary (including prior scope determinations)." It does not restrict such determinations to only those addressing the countries involved in the scope proceeding at issue.

[5] AA Metals disagreed with this contention at oral argument, however, it did not point to any evidence to support its position.

product" that "falls squarely within the scope of these investigations" and that they intended to include such "re-roll" stock in the scope of the investigations.  Id.

In response to these comments, Commerce stated that "the petitioners are uniquely situated to opine on the definition of merchandise that would be subject to the investigations," and squarely endorsed petitioners's definition of the scope.  Id. at 11.  Commerce also echoed petitioners's definition, stating "[r]e-roll stock is flat-rolled, coiled aluminum product."  Id.  Commerce also stated that re-roll stock was not excluded from the scope, "even where it might be identified as an 'intermediate product.'"  Id.  Although not explicitly addressing F-tempered products that might be other than re-roll stock, Commerce stated "[w]e continue to find that products that otherwise meet the definition of aluminum sheet in the first paragraph of the scope are subject to the scope."  Id.

The 2021 Final Determination is highly persuasive, as it clearly addressed a (k)(1) scope factor and as it effectively responded to the allegation that F-tempers were not covered by the ITC injury determination.  Therefore, if the F-temper re-roll stock meets the definition of aluminum sheet in the first paragraph of the scope language, it is within the scope of the Orders.  Here, AA Metals identified the Scenario 2 product, on its arrival to Turkey, as [[                    ]] re-roll stock with a thickness of [[     ]] mm.  IQR, Ex. 6; SQR at 12.  The product upon entry into Turkey is re-roll stock, with a thickness and aluminum alloy number within scope of the order.  There is no dispute that upon exportation from Turkey the product, if still a product of China, was within the scope of the Orders.

**B.  Scenario 2 Product is Wrought, Flat-Rolled Common Alloy Aluminum Sheet**

AA Metals contends that the Scenario 2 product upon entry into Turkey is unwrought, continuous cast coil.  See AA Metals Br. at 18; SQR at 22.  Plaintiff and defendant agree that

*Confidential Information Omitted*

continuous cast coil is unwrought and outside the scope of the Orders, despite having a coiling

process as part of the continuous cast procedure.[6]  Commerce, however, determined in the Final

Scope Determination that the Scenario 2 product was in fact a wrought, rolled product and not an

unwrought, upstream product as AA Metals contends.  Final Scope Determination at 8.

The United States relies on two factual matters from AA Metals's own exhibits in its

questionnaire answers.  First, the Government argues that Commerce correctly concluded that

the alloy designation number of Scenario 2 identified the product as wrought aluminum alloy.

Government Br. at 13; see also Final Scope Determination at 8.  According to the Aluminum

Association, wrought aluminum alloy uses a four-digit whole number to identify they type of

alloy, shown as XXXX.  SQR, Ex. 19 at Appendix A-10A-1.  In contrast, cast aluminum alloy

uses a four-digit number system with a decimal point between the third and fourth digits, shown

as XXX.X.  SQR, Ex. 19 at Appendix A-10A-3.  Scenario 2 product has a four-digit, whole-

number alloy designation of [[      ]].  IQR, Ex. 6 (in which AA Metals's business records list

Scenario 2 merchandise from China as [[      ]] alloy F-temper products within the dimension set

forth in the scope).  The Government argues that the alloy designation number of Scenario 2

indicates that the product is wrought, not cast, aluminum alloy.  Government Br. at 13.

Second, the Government argues that a diagram AA Metals submitted as part of the

Supplemental Questionnaire narrative indicates that the product is rolled, wrought aluminum.

Government Br. at 14; see also Final Scope Determination at 8 n.50.  According to this diagram,

which is titled "Processing" and sourced from the Aluminum Association, sheet aluminum is

only created after casted products, such as ingots and slabs, go through a rolling process.  SQR at

---

[6] Apparently, defendant-intervenor contends that all continuous casting results in rolled merchandise that is within
the scope of the Orders.  The court need not address this contention as, even under Commerce's narrower view, the
product is within scope.

23. As Scenario 2 product is sheet, the Government argues, it must have undergone a flat-rolling process, separate from any coiling that may have occurred during the casting process. See Government Br. at 14; see also Final Scope Determination at 8 n.50; SQR, Ex. 6 at I-15–I-18.

The Government relied on the information AA Metals provided in its questionnaire responses to determine that the Scenario 2 product upon entry into Turkey was wrought, flat-rolled sheet. The Government's determination was supported by the substantial evidence.

## IV.     AA Metals' Answers Were Not Deficient

AA Metals argues that Commerce should have provided it an opportunity to "address and correct" deficiencies in the record. AA Metals Br. at 17–21. AA Metals argues that Commerce concluded that Scenario 2 merchandise was wrought aluminum as a result of a deficient response. Id. at 17. AA Metals contends that Scenario 2 merchandise was unwrought and that it did not have any notice that Commerce disagreed. Id. at 20. AA Metals asserts this lack of notice prevented AA Metals from responding to this inconsistency, creating an error in law. Id. at 17.

The law governing notice of deficiencies in the record states "[i]f the administering authority or the Commission determines that a response to a request for information under this subtitle does not comply with the request, the administering authority . . . shall promptly inform the person submitting . . . and shall . . . provide that person with an opportunity to remedy or explain the deficiency . . . ." 19 U.S.C. § 1677m(d) (2023).

AA Metals asserts that Commerce's determination that the Scenario 2 aluminum was not "continuous cast coil" constituted a deficiency. AA Metals Br. at 17, 20. This is not the case. Commerce determined from AA Metals's questionnaire responses, not that the responses AA Metals provided were deficient, but that the answers AA Metals gave demonstrated that Scenario

2 merchandise was within scope. Final Scope Determination at 9. AA Metals appears to read "deficient" to mean "in conflict with the desires of the company under investigation." Such an understanding would twist the meaning of the statute beyond recognition. In addition to the textual argument, to assume that Commerce has a duty to inform and allow for correction every time the agency makes a decision that is in conflict with the position of a party would render Commerce's duty to implement EAPA completely unadministrable. It is not Commerce's duty to notify a company that there will be a ruling adverse to its interests. AA Metals's argument fails. The court concludes that Commerce's inquiries were sufficiently clear and, indeed, were equally clearly answered.

## V.      Additional Substantial Transformation Analysis Was Not Necessary

Plaintiff argues that Commerce was required to perform a substantial transformation analysis to determine if the sheet product that entered the United States was a product of Turkey and not China. AA Metals's Br. at 32–37. It cites the traditional test of change in name, character, or use that is used for Customs country-of-origin determinations and that Commerce has used in unfair trade proceedings, as plaintiff has noted. Pl. AA Metals, Inc., Reply Br. at 14–17, ECF No. 30 (Dec. 1, 2022); SQR at 10; see also Cyber Power Sys. (USA) Inc. v. United States, 46 CIT __, __, 560 F. Supp. 3d 1347, 1350 (2022) (citing Torrington, Co. v. United States, 764 F.2d 1563, 1568 (Fed. Cir. 1985); E.I. Du Pont de Nemours & Co. v. United States, 22 CIT 370, 372, 8 F. Supp. 2d 854, 857 (1998). Commerce, however, is not required to apply this traditional test if it has administrative reasons to proceed differently. See Canadian Solar, Inc. v. United States, 918 F.3d 909, 918–919 (Fed. Cir. 2019).

Here, the Orders specify that:

Subject merchandise includes common alloy sheet that has been further processed in a third country, including but not limited to annealing, tempering, painting,

varnishing, trimming, cutting, punching, and/or slitting, <u>or any other processing</u> <u>that would not otherwise remove the merchandise from the scope of the order if</u> <u>performed in the country of manufacture of the common alloy sheet.</u>

<u>Antidumping Order</u>, 84 Fed. Reg. at 2815; <u>Countervailing Order</u>, 84 Fed. Reg. at 2158 (emphasis added).

Consistent with this language, Commerce stated that the re-rolling was a further process that did not remove the merchandise from the scope of the Orders, irrespective of the country of further processing. Final Scope Determination at 9. Plaintiff has never explained why Commerce's order language is not a reasonable way to bring all of the sheet product that originates in China that was found to cause injury into the scope of the Orders.

Here, according to Commerce's findings as to Scenario 2, the aluminum sheet exported to Turkey was within the scope of the Orders and the finished common alloy aluminum sheet further processed in Turkey and exported to the United States was also within the scope of the Orders. Final Scope Determination at 8–9 (finding that the aluminum alloy designation number clearly marks Scope 2 merchandise as wrought aluminum, and that the F-temper was properly within scope); IQR, Ex. 6; SQR at 13, 16. Further rolling was "other processing" that did not remove the merchandise from the scope of the Orders because, under the terms of the Orders, the processing would not have removed the product from the scope if performed in China. Final Scope Determination at 9. This is not a transformation that affects the scope as set forth in the Orders. Because there is agreement that the product that entered the United States from Turkey was as described in the Orders and the court has already determined that the product that left China was a product described in the Orders, the product that entered the United States was within the scope of the Orders.

**CONCLUSION**

The court determines that either Commerce did not commit error in interpreting the scope of the Orders or that such error was not harmful; and it otherwise did not expand the Orders beyond their scope.  Accordingly, the court sustains Commerce's Final Scope Determination.

_/s/ Jane A. Restani_____
Jane A. Restani, Judge

Dated:  _March 10, 2023_____
New York, New York